# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT GREENEVILLE

| | | |
|---|---|---|
| ZACKERY BECK, | ) | |
| | ) | Case No. 2:17-cv-178 |
| *Plaintiff*, | ) | |
| | ) | Judge Travis R. McDonough |
| v. | ) | |
| | ) | Magistrate Judge Clifton L. Corker |
| HAMBLEN COUNTY, TENNESSEE and | ) | |
| ESCO JARNAGIN, | ) | |
| | ) | |
| *Defendants*. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court is a motion for summary judgment filed by Defendants Hamblen County, Tennessee ("Hamblen County") and Sheriff Esco Jarnagin[1] ("Jarnagin") (collectively, "Defendants") (Doc. 32). For the reasons set forth below, Defendants' motion will be **GRANTED IN PART** and **DENIED IN PART**.

## I.    BACKGROUND

The Tennessee Corrections Institute ("TCI") has the authority to "[e]stablish minimum standards for correctional programs of treatment, education and rehabilitation of inmates and standards for the safekeeping, health and welfare of inmates," as well as to "[i]nspect all local jails, lock-ups, workhouses and detention facilities at least once a year and publish the results of the inspections." Tenn. Code Ann. § 41-4-140(a)(1), (3). If inspection of a local correctional

---

[1] Although Defendants spell Defendant Sheriff's surname "Jarnigan," the Court takes judicial notice that it is spelled "Jarnagin" on the Hamblen County website. *See* http://www.hamblencountytn.gov/sheriffs-department-and-jail/. Accordingly, the Court will use this latter spelling throughout its opinion.

facility reveals that it fails to comply with the minimum standards, the correctional facility may be given an additional sixty days to bring the facility into compliance. Tenn. Code Ann. § 41-4-140(b)(1). However, "the certification status given a facility upon reinspection shall be the facility's status until the next annual inspection." *Id.*

The Hamblen County Jail has been recommended for non-certification for failure to comply with the TCI's minimum standards at least from 2010 to 2017. (Doc. 39-1, at 133 (2010), 147 (2011), 162 (2012), 177 (2013), 185 (2014), 210 (2015), 227 (2016), 234 (2017).) A review of the TCI's annual reports between May 3, 2010, and August 29, 2017, reveals a number of deficiencies including overcrowding, insufficient security checks, inadequate staffing, difficulty with properly classifying inmates, failure to provide information about reporting sexual assault to inmates, and many incidents of inmate-on-inmate assault. (*E.g.*, *id.* at 144, 174, 179, 182, 188, 190, 197, 199, 205–06, 214, 222–23, 231–32, 237–39.) Specifically, TCI reports indicate that: (1) "criminal history check[s] [were] not being completed on inmates during the booking process"; (2) "[c]lassification problems were evident due to the number of inmate on inmate assaults"; (3) "[the Jail] does not have sufficient staff to perform the functions related to security, custody, and supervision of inmates"; (4) "lack of security checks are a direct reflection of insufficient staffing to perform the necessary duties to maintain the safety and security throughout the facility"; (5) "physical security checks had time gaps of up to 2 hours between checks"; and (6) "[f]rom January 1 to July 7, 2016, [there were] 153 incidents of inmate on inmate assaults." (*Id.* at 206, 214, 222–23, 230–32.) Hamblen County Jail is certified for 255 inmates and has 255 beds. (*Id.* at 241.) Additionally, the Jail Annex is certified for 24 inmates. (*Id.*) However, the average daily population ("ADP") calculated in the TCI reports in 2016 and

2017 was 375 and 392, respectively. (*Id.* at 224, 236.) Additionally, there are times when more than 100 inmates have slept on the floor. (*Id.* at 243–44.)

Defendant Esco Jarnagin is the Sheriff of Hamblen County. (*Id.* at 218.). Jarnagin and other Hamblen County officials have acknowledged that the Hamblen County Jail fails to meet the minimum TCI standards, that overcrowding is a pervasive issue, that many of the same problems that existed eleven years ago still exist today, and that the number of inmate-on-inmate assaults continues to rise. (*Id.* at 242, 243, 32, 44.) Jarnagin has also acknowledged that overcrowding makes it difficult to classify inmates by sex and necessary level of security and that nonviolent and violent offenders are frequently intermingled. (*Id.* at 25, 30.) When asked whether it would cost anything to fix the classification system, Jarnagin testified that it would probably require manpower but that "it wouldn't cost anything per se." (*Id.*) Correctional Officer Dustin Lee Tharp testified that he fears going to work at the Hamblen County Jail and that he does not believe the facility's practices were designed to keep him safe. (*Id.* at 266.) Tharp also believes overcrowding and staffing issues make the Jail unsafe for inmates. (*Id.* at 268.)

Prior to working a shift at the Hamblen County Jail, new correctional officers undergo a week of training with a field training officer. (Doc. 32-1, at 55.) After this initial training, correctional officers shadow a more experienced officer. (*Id.*) By the end of the first year of employment, each officer is required to receive forty hours of training from TCI at the Basic Jailer School. (*Id.*) Additionally, correctional officers are required to complete forty hours of training each year. (*Id.*).

On October 3, 2016, Plaintiff Zackery Beck was arrested for the manufacture, delivery, sale, or possession of Schedule II drugs (methamphetamine), Schedule VI drug violations, and

Schedule III drug violations.  (Doc. 32-1, at 2–3.)  At least one of these charges was a felony

offense.  (*See id.* at 2.)  The following day, October 4, 2016, Plaintiff was booked at the Hamblen

County Jail.  (*Id.*)  Booking Officer Megan Swift conducted a screening of Plaintiff, as required

by the Prison Rape Elimination Act ("PREA"), to determine whether he was at risk of sexual

assault.  (*Id.* at 55.)  When an inmate is deemed at risk of sexual assault, he is "placed in an area

or cell where there is a lessened risk of sexual assault by other inmates."  (*Id.*)  On the "PREA

Screening" form, Swift indicated that Plaintiff's "Victim Scored Designation" was "Non-

Victim."  (*Id.* at 30.)  Plaintiff did not inform Swift that he believed he was at risk of assault by

any specific individual.  (*Id.* at 13.)  There is also a "Status Classification Assessment Sheet" that

was filled out with Plaintiff's name and information upon booking.  (*Id.* at 28.)  However, this

sheet does not identify Plaintiff's classification; it simply reads "NO STATUS ASSESSMENT

RECORD AVAILABLE FOR THIS INMATE."  (*Id.*)  According to Plaintiff, as he was being

escorted to his cell, another inmate warned the correction officer not to "put him in little

Mexico" because it would be "bad for him."[2]  (Doc. 39-1, at 61.)

       Plaintiff was initially placed in a four-bed cell, A-4,[3] in an area of the jail known as "the

slams."  (Doc. 32-1, at 22, 33, 39; Doc. 39-1, at 101.)  However, at the time Plaintiff was housed

in A-4, he shared the cell with only two other inmates, Sergio Cisneros and William Rayle.

(Doc. 32-1, at 22, 33, 39, 41.)  A-4 has two other cells adjacent to it, A-3 and A-5, with A-4

---

[2] In their reply, Defendants argue that Plaintiff cannot rely upon this statement to create a
genuine issue of material fact because it constitutes hearsay.  (Doc. 40, at 2.)  As an initial
matter, statements that are not relied on for the truth of the matter asserted, but only as a means
of showing notice, such as warnings, are not considered hearsay.  *See* Fed. R. Evid. 801(c)(2).
Nonetheless, whether this statement would be admissible is immaterial because the Court does
not rely on this statement in its ultimate determination of Defendants' motion for summary
judgment.

[3] Throughout the joint appendix, this cell is referred to interchangeably as A-104 and A-4.  For
clarity, throughout the Court's opinion it will be referred to only as A-4.

located in the center.  (Doc. 39-1, at 101).  The structure of the cells makes it possible for inmates to reach through into the adjacent cells.  (*Id.*)

On October 7, 2016, an inmate in A-3 informed Plaintiff that he would be able to see the television if he came over to the side of A-4 closest to A-3.  (*Id.* at 71–72.)  Plaintiff moved to the side of A-4 closest to A-3 and, at that time, the inmate in A-3 "grab[bed him] through the bars" and "put[ ] a shank to [his] throat."  (*Id.* at 72.)  At the same time, Plaintiff describes that "Choco,"[4] housed with him in A-4, came up behind him and "pull[ed his] pants down . . . to check [him] for drugs with his fingers."  (*Id.* at 73.)  During the assault, the inmate in A-3 continued to hold the shank to Plaintiff's throat and Plaintiff was told not to move or make any noise or he would be killed.  (*Id.* at 74.)  Plaintiff did not immediately report the assault to any correctional officers or jail staff.[5]  (Doc. 32-1, at 15.)

Several days later, on October 10, 2016, Plaintiff was moved from A-4 to Isolation Cell 4 because, according to other inmates, he was stealing food from them.  (Doc. 32-1, at 15–16, 31.)  On October 12, 2016, Plaintiff filled out a medical request at a kiosk within the jail.[6]  (*Id.* at 78.)  Plaintiff wrote:  "I got checked out of the slams.  They dug into my ass thinking I had a pack and it hasn't stopped bleeding and I'm starting to really worry.  Help ASAP."  (*Id.* at 78–79.)

---

[4] It is believed that Plaintiff uses "Choco" to refer to Cisneros.  (Doc. 39-1, at 60, 73, 110.)

[5] According to Lieutenant Gerry Hambrick, the policy of the Hamblen County Jail "is that, if an inmate comes to a correction officer and tells the correction officer that his life [is] in danger, or he is in danger of being assaulted, or sexually assaulted, each individual correction officer has the authority to and does pull the inmate out of that area and places him elsewhere in the jail." (Doc. 32-1, at 54.)  Hambrick also avers that, "[o]n average, an officer will physically walk into each different cell or pod area at least once an hour."  (*Id.* at 55.)  However, Plaintiff testified that correctional officers did not always come by regularly.  (Doc. 39-1, at 75 ("It could be an hour and then another hour before an officer comes there and then it could be a two-hour delay, just depending on the shifts.").)

[6] Kiosks located within the jail are used for "medical requests, information requests, grievance procedure and to order commissary."  (Doc. 39-1, at 119.)

Plaintiff also reported the incident to his mother during a phone call. (Doc. 32-1, at 47; Doc. 39-1, at 81–82.)

On October 13, 2016, inmate Nathan James, outside of his cell during his recreation time, used a shoestring to open Plaintiff's cell door, enter, and attack him, punching him in the throat multiple times.[7] (*Id.* at 16–17.) After this incident, correctional officers moved Plaintiff from Isolation Cell 4 to a cell in an area referred to as WCOT. (*Id.* at 31.) In Plaintiff's own words, he

> wasn't in [WCOT] five minutes till everybody in that place was fixing to beat the crap out of me and I started kicking on the door to get the cops back. And [the correctional officer] literally c[a]me in there and was like, Guys, don't bother him or you all are going to be in trouble, tried to leave me in there, and closed the door a second time and I started kicking on it again and that's when he took me to E-4 which is called the fish bowl.

(*Id.* at 18.) Later on October 13, 2016, Plaintiff was found by correctional officers with a blanket wrapped around his neck in E-4. (Doc. 32-1, at 46.) Plaintiff testified that he "wasn't going to kill [him]self," but that he "wanted to have a way of . . . trying to express it to get out to talk to somebody . . . and tell them what happened [be]cause [he did not] trust the guards." (*Id.* at 19.) Plaintiff was taken to see Sarah Moon, the nurse on duty. (*Id.*) Plaintiff informed Moon about the earlier sexual assault and she referred him to the hospital. (Doc. 32-1, at 47; Doc. 39-1, at 82.) Plaintiff was taken to Morristown Hamblen Hospital where he reported that he had experienced rectal bleeding after another inmate stuck his finger up his rectum looking for drugs six days prior. (Doc. 32-1, at 48.) Plaintiff's medical records indicate he suffered a "small rectal

---

[7] In his response to Defendants' motion for summary judgment, Plaintiff "abandons any claim against [Jarnagin] concerning the alleged assault on October 13, 2016." (Doc. 39, at 3 n.4.) Accordingly, the facts surrounding the October 13 assault are included only for background; the Court will consider only the facts pertaining to the alleged sexual assault in determining whether Jarnagin is entitled to summary judgment on this claim.

tear at the six o'clock position."[8]  (*Id.* at 52.)  Plaintiff was released back to Hamblen County jail that same day.  (*Id.* at 53.)

Doug Rich, a Field Training Officer at the time of the incident in this case,[9] was charged with investigating certain types of assaults at the Hamblen County Jail.  (Doc. 39-1, at 108 ("If it was just a simple jail assault with not a lot of bodily injury, then I would have done it.").)  Rich received no training from Hamblen County specifically focused on investigation of sexual assault.  (*Id.*)  Nevertheless, Rich spoke to Plaintiff about the sexual assault he suffered and informed Plaintiff that he would "look into" it and give Cisneros a lie-detector test.[10]  (Doc. 39-1, at 82–83, 85.)  Rich never followed up with Plaintiff regarding his investigation into the sexual assault.  (Doc. 39-1, at 85.)  Rich did, however, interview Cisneros, who said no one raped or pulled a shank on Plaintiff, but that Cisneros did threaten to break Plaintiff's jaw if he did not stop stealing food.  (*Id.* at 109.)  Cisneros was also administered a lie-detector test by Detective Brooks which indicated that there was "no deception."  (*Id.* at 121.)  Rich also noted in his report that he received differing reports from the hospital:  "One report stated that there was rectal bleeding and another said that there was a small rectal tear with no bleeding."  (*Id.* at 113.)  Rich did not recall whether he discussed these medical records with any medical staff at the Jail but he testified that he received no training concerning review of medical records.  (*Id.* at 114–15.)  Rich also testified that, if during his investigation, he was not able to "come up with an answer," he would contact the district attorney's office.  (*Id.* at 115.)  In Plaintiff's case, Rich testified that

---

[8] Plaintiff's medical records also indicate that he suffered "head trauma and lip contusion secondary to physical altercation.  Has throat pain and difficulty swallowing secondary to a suicide attempt."  (Doc. 32-1, at 52.)

[9] Rich is no longer employed by Hamblen County.  (Doc. 39-1, at 98.)

[10] Plaintiff testified that he could not remember whether he spoke with Rich before or after he was transported to the hospital.  (Doc. 39-1, at 82–83.)

he had "no idea of who was telling the truth." (*Id.*) Ultimately, the district attorney's office informed Rich there was not enough evidence to convict anyone. (*Id.* at 116.)

Plaintiff initiated this lawsuit on October 3, 2017. (Doc. 1.) In his complaint, Plaintiff alleges that Defendants violated his Fourth, Eighth, and Fourteenth Amendment rights.[11] He asserts claims against Jarnagin for deliberate indifference to inmate safety and failure to protect him from other inmates, brought pursuant to Title 42, Section 1983 of the United States Code, as well as state-law claims for negligence and intentional infliction of emotional distress. (*Id.* at 8–9, 11–13, 14–15.) He asserts claims against Hamblen County for maintaining policies, customs, and practices that fail to keep inmates safe and failure to train, brought pursuant to Title 42, Section 1983 of the United States Code, as well as a state-law claim for negligence.[12] (*Id.* at 9–11, 13–14.) Defendants filed a motion for summary judgment (Doc. 32), and this motion is now ripe for the Court's review.

## II. STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court views the evidence in the light most favorable to the nonmoving party and

---

[11] In the instant case, Plaintiff was a pretrial detainee at the time of his injury. Thus, the applicable constitutional provision is the Due Process Clause of the Fourteenth Amendment, rather than the Eighth Amendment which applies only to convicted prisoners. *Essex v. Cty. of Livingston*, 518 F. App'x 351, 353 (6th Cir. 2013). Nevertheless, this does not change the Court's analysis with respect to the claims against Jarnagin or Hamblen County. *See id.*; *Ford v. Cty. of Grand Traverse*, 535 F.3d 483, 494–95 (6th Cir. 2008) (describing that the same deliberate-indifference inquiry applies under the Fourteenth and Eighth Amendments); *see also Richko v. Wayne Cty.*, *Mich.*, 819 F.3d 907, 915 (6th Cir. 2016) ("The analysis set forth in *Farmer*, although rooted in the Eighth Amendment, . . . applies with equal force to a pretrial detainee's Fourteenth Amendment claims.").

[12] Although Plaintiff originally asserted an intentional-infliction-of-emotional-distress claim against Hamblen County in his complaint, he makes clear in his response to Defendants' motion for summary judgment that he has abandoned that claim. (Doc. 39, at 3 n.3.)

makes all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

The moving party bears the burden of demonstrating that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The moving party may meet this burden either by affirmatively producing evidence establishing that there is no genuine issue of material fact or by pointing out the absence of support in the record for the nonmoving party's case. *Celotex*, 477 U.S. at 325. Once the movant has discharged this burden, the nonmoving party can no longer rest upon the allegations in the pleadings; rather, it must point to specific facts supported by evidence in the record demonstrating that there is a genuine issue for trial. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002).

At summary judgment, the Court may not weigh the evidence; its role is limited to determining whether the record contains sufficient evidence from which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). A mere scintilla of evidence is not enough; the Court must determine whether a fair-minded jury could return a verdict in favor of the non-movant based on the record. *Id.* at 251–52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). If not, the Court must grant summary judgment. *Celotex*, 477 U.S. at 323.

## III.   ANALYSIS

### A.   Section 1983 Claims

#### i.   *Jarnagin*

Plaintiff alleges that Jarnagin exhibited deliberate indifference to inmate safety and failed to protect him from assault by another inmate.[13]  (Doc. 1, at 8–9, 11–13.)  Jarnagin asserts that he is entitled to qualified immunity from Plaintiff's § 1983 claims.

The doctrine of qualified immunity "shields governmental officials from monetary damages as long as their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Sumpter v. Wayne Cty.*, 868 F.3d 473, 480 (6th Cir. 2017) (internal quotation marks omitted).  In deciding whether a defendant is entitled to qualified immunity at the summary judgment stage, the Court employs a two-part test, which may be conducted in either order.  *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).  First, the Court determines whether the facts, viewed in the light most favorable to the plaintiff, show that the official violated a constitutional right.  *Holzemer v. City of Memphis*, 621 F.3d 512, 519 (6th Cir. 2012).  Second, if a constitutional right was violated, the Court determines whether the right was clearly established at the time the violation occurred.  *Id.*  A right is clearly established when "binding precedent from the Supreme Court, the Sixth Circuit, the district court itself, or other circuits . . . is directly on point" such that a reasonable official

---

[13] Plaintiff asserts two counts in his complaint against Jarnagin, Counts One and Three.  (*See* Doc. 1, at 27–32, 43–51.)  However, the Court is unable to discern the difference between them. In Plaintiff's response to Defendants' motion for summary judgment, he asserts that Count One is for deliberate indifference to inmate safety and Count Three is for failure to protect Plaintiff from other inmates.  (Doc. 39, at 2.)  However, under *Farmer v. Brennan*, 511 U.S. 825 (1994), and as discussed in greater detail below, to succeed on a claim for failure to protect, Plaintiff must show both that he is incarcerated under conditions posing a substantial risk of harm and that the defendant exhibited deliberate indifference to his safety.  *Id.* at 834.  Thus, in the Court's view, these two counts merge into one inquiry.

Case 2:17-cv-00178-TRM-MCLC   Document 41   Filed 04/12/19   Page 10 of 28   PageID #: 670

would be on notice that his conduct violates that right, even in novel factual circumstances. *Id.* at 527 (internal quotation marks omitted).

The plaintiff bears the burden of "satisfy[ing] both inquiries in order to defeat the assertion of qualified immunity." *Sumpter*, 868 F.3d at 480. "In so doing, the plaintiff must, at a minimum, offer sufficient evidence to create a 'genuine issue of fact,' that is, 'evidence on which [a] jury could reasonably find for the plaintiff.'" *Williams v. Godby*, 732 F. App'x 418, 420 (6th Cir. 2018) (quoting *Anderson*, 477 U.S. at 252, 256). In other words, if the Court "determines that the plaintiff's evidence would reasonably support a jury's finding that the defendant violated a clearly established right, the court must deny summary judgment." *Id.* (citing *DiLuzio v. Vill. of Yorkville*, 796 F.3d 604, 609 (6th Cir. 2015); *McDonald v. Flake*, 814 F.3d 804, 812 (6th Cir. 2016); *see also Dickerson v. McClellan*, 101 F.3d 1151, 1158 (6th Cir. 1996) ("Summary judgment is not appropriate if there is a genuine factual dispute relating to whether the defendants committed acts that allegedly violated clearly established rights.").

"[P]rison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (citation omitted). The Sixth Circuit has held on many occasions prior to the events occurring in this case that "the constitutional right to be free from deliberate indifference to assault and sexual abuse" is clearly established. *Bishop v. Hackel*, 636 F.3d 757, 766 (6th Cir. 2011); *see also Leary v. Livingston Cty.*, 528 F.3d 438, 442 (6th Cir. 2008); *Doe v. Bowles*, 254 F.3d 617, 620 (6th Cir. 2001).

However, not every injury "suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety." *Id.* at 834. To hold a prison official liable, two requirements must be met. First, the deprivation alleged must be, objectively, "sufficiently serious," (the "objective prong") and second, the prison

Case 2:17-cv-00178-TRM-MCLC   Document 41   Filed 04/12/19   Page 11 of 28   PageID #: 671

official must have been deliberately indifferent to plaintiff's health or safety (the "subjective prong"). *Id.*

      a.    <u>Objective Prong</u>

"For a claim . . . based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. The objective component is analyzed "in the abstract." *Richko v. Wayne Cty., Mich.*, 819 F.3d 907, 916 (6th Cir. 2016) (quoting *Clark-Murphy v. Foreback*, 439 F.3d 280, 286–87 (6th Cir. 2006)). Although constitutional claims stemming from prison conditions typically may not be based on the totality of the circumstances, some conditions of confinement may establish such a violation in combination if they "had the mutually enforcing effect of depriving [a plaintiff's] right to personal safety." *Thompson v. Cty. of Medina, Ohio*, 29 F.3d 238, 243 n.1 (6th Cir. 1994) (citing *Wilson v. Seiter*, 501 U.S. 294, 303 (1991)).

Plaintiff argues that "the risk came from housing [Plaintiff] in a mixed classification area of the Jail, inadequately-staffed, isolated from control-room video monitors, without routine safety checks in a Jail where inmate-to-inmate assaults were increasingly prevalent." (Doc. 39, at 15.) Viewing the evidence in the light most favorable to Plaintiff, he has demonstrated that inmate-on-inmate violence regularly occurred at Hamblen County Jail—and that the number of these incidents was on the rise—that the jail was overcrowded, that inmates were not properly classified, and that security checks were, at times, conducted quite infrequently.[14] This evidence

---

[14] In their reply, Defendants argue that Plaintiff "does not provide proof that was subject to any particular jail conditions on the day in question." (Doc. 40, at 4.) The evidence shows that a re-inspection of Hamblen County Jail occurred on August 29, 2016—nine days prior to Plaintiff's alleged sexual assault—and the TCI report summarizing that inspection identifies Hamblen County Jail as being overcrowded, notes, among other things, that the Jail "does not have sufficient staff to perform the functions related to security," "lack of security checks are a direct reflection of insufficient staffing to perform the necessary duties to maintain the safety and

Case 2:17-cv-00178-TRM-MCLC   Document 41   Filed 04/12/19   Page 12 of 28   PageID #: 672

is at least sufficient to raise a question of fact as to whether *Farmer*'s objective prong has been satisfied, or, in other words, a jury viewing this evidence and making all reasonable inferences in Plaintiff's favor could find that a substantial risk of serious harm existed at the jail. *Accord Lopez v. LeMaster*, 172 F.3d 756, 760–62 (10th Cir. 1999); *Hale v. Tallapoosa Cty.*, 50 F.3d 1579, 1583 (11th Cir. 1995).

b.     Subjective Prong

A prison official is deliberately indifferent "only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. Thus, "prison officials . . . may be found free from liability if they responded reasonably" to a risk of serious harm, "even if the harm ultimately was not averted." *Id.* at 844; *see also Mangum v. Repp*, 674 F. App'x 531, 540 (6th Cir. 2017).

A plaintiff may rely on circumstantial evidence to prove subjective recklessness, "and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842. "For example, if [a] . . . plaintiff presents evidence showing that a substantial risk of inmate attacks was 'longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.'" *Id.* at 842–43 (citation

---

security throughout the facility," "physical security checks had time gaps of up to 2 hours between checks," and "[f]rom January 1 to July 7, 2016, [there were] 153 incidents of inmate on inmate assaults." (Doc. 39-1, at 227–32.) Additionally, the prison population on the date of re-inspection was 360 and the ADP was 365. (*Id.* at 225, 229.) The next inspection occurred almost a year later, on August 18, 2017, and revealed that the same conditions were present at the Jail. (*Id.* at 234–39.) This evidence is sufficient to support an inference that these conditions were present on the day of Plaintiff's alleged assault.

omitted). "But the plaintiff also must present enough evidence from which a jury could conclude that [the] defendant so recklessly ignored the risk that he was deliberately indifferent to it." *Rhinehart v. Scutt*, 894 F.3d 721, 738 (6th Cir. 2018) (internal quotation marks and citation omitted).

> The relevant inquiry
>
> is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial "risk of serious damage to his future health," and it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk.

*Farmer*, 511 U.S. at 843 (internal citation omitted). In other words, a plaintiff is "not required to show that [the defendant] knew 'precisely who would attack whom,' but only that [the defendant] had subjective knowledge of a generalized, substantial risk of serious harm from inmate violence." *Hale*, 50 F.3d at 1583 (citing *Farmer*, 511 U.S. at 844.) Moreover, the Sixth Circuit has recognized that "[a] case could be made as to the . . . liability of a sheriff responsible for a jail where 'inmate-on-inmate violence occurred regularly when the jail was overcrowded . . . .'" *Fisher v. Cocke Cty.*, No. 95-5359, 1996 WL 520793, at *4 (6th Cir. Sept. 12, 1996).

Here, Plaintiff has presented evidence that, among other things, Hamblen County Jail: (1) failed to conduct criminal history checks upon booking; (2) conducted infrequent security checks; (3) failed to properly classify inmates; and (4) experienced increasingly high numbers of inmate-on-inmate assaults. Because each of these TCI reports was addressed to Jarnagin as Sheriff (*see, e.g.*, Doc. 39-1, at 218), Jarnagin was aware that many of the problematic conditions in the Jail had remained unchanged for years (*id.* at 32), that violent and nonviolent inmates were often intermingled (*id.* at 30), and that inmate-on-inmate assaults were increasing (*id.* at 26–27). This evidence shows that the conditions were "longstanding, pervasive, [and] well-documented"

and suggests that Jarnagin "had been exposed to information concerning the risk." *Farmer*, 511 U.S. at 842. Thus, this evidence is sufficient to permit a trier of fact to find that Jarnagin had actual knowledge of the risk. *See id.* at 842–43; *see also Cooper v. Cty. of Washtenaw*, 222 F. App'x 459, 467 (6th Cir. 2007) (describing that "once actual knowledge of the risk [is] shown at the summary judgment stage, the question of whether there was conscious disregard of that risk [is] to be determined by the jury").

Although Defendants point out that Jarnagin did not know of any *specific* risk posed by the inmate who sexually assaulted Plaintiff (Doc. 33, at 12), *Farmer* nullifies this argument. *Id.* at 843 ("[A] prison official [cannot] escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault."); *see also Taylor v. Michigan Dep't of Corr.*, 69 F.3d 76, 81 (6th Cir. 1995) ("*Farmer* makes it clear that the correct inquiry is whether [the defendant] had knowledge about the substantial risk of serious harm to a particular class of persons, not whether he knew who the particular victim turned out to be.").

Nevertheless, Jarnagin may be found free from liability if he responded to the risk reasonably. *Farmer*, 511 U.S. at 844. Jarnagin argues that the booking officer completed a PREA screening form for Plaintiff during booking and that Jarnagin "has gone to the Hamblen County Commission to ask for measures to be taken to fix these issues" but budget constraints have prevented such measures. (Doc. 40, at 6.) "While any such efforts by [Jarnagin] would appropriately be considered by a jury determining whether [Jarnagin] was deliberately indifferent, such efforts would not necessarily absolve him or [Hamblen County] of liability." *Hale*, 50 F.3d at 1584. Jarnagin admitted he was aware of the issues at the Jail and that certain

problems, such as fixing the classification of inmates, would not necessarily require additional funding. (Doc. 39-1, at 25, 30.) A jury could find that, despite efforts to construct a new jail or obtain additional funding, Jarnagin was deliberately indifferent by disregarding alternative or interim fixes to reduce the risk of inmate-on-inmate assaults. *See id.*; *LeMaster*, 127 F.3d at 762. When viewed in the light most favorable to Plaintiff, a reasonable juror could find that Jarnagin perceived facts from which he inferred a substantial risk of harm to Plaintiff, and that he disregarded that risk.

        c.    <u>Causation</u>

Next, Defendants argue that Plaintiff has not provided sufficient evidence of causation between Jarnagin's deliberate indifference to the conditions of the Jail and Plaintiff's injury.[15] (Doc. 33, at 15; Doc. 40, at 5.). Proximate causation is an essential element of a § 1983 claim for damages. *Doe v. Sullivan Cty., Tenn.*, 956 F.2d 545, 550 (6th Cir. 1992). "An injury is proximately caused by an act when it appears from the evidence in the case that the defendant's conduct was a substantial factor in bringing about the plaintiff's harm" and "the presence of other possible causes for [the plaintiff's] injuries does not bar him from recovering from the defendant if [the defendant's] conduct is the most likely cause." *Hickerson v. Koepp*, Nos. 95-1890, 95-1982, 1997 WL 56961, at *3–*4 (6th Cir. Feb. 10, 1997). Moreover, "[u]nless the evidence is such that a reasonable person could reach only one conclusion, proximate cause is a

---

[15] Defendants specifically argue that Plaintiff was being charged with a felony offense and Cisneros was incarcerated for violation of probation and failure to appear, and, "[a]s such, [Plaintiff] cannot argue that he was a misdemeanor non-violent inmate placed in a cell with a violent inmate that was charged with a felony." (Doc. 40, at 5.) However, that is not dispositive here. As an initial matter, a criminal history check conducted during booking would likely consider more than just the instant offense. Moreover, Plaintiff does not base his claim solely on classification; he argues that unsafe conditions including overcrowding, failure to properly classify inmates, and insufficient security checks collectively caused his assault. *See Thompson*, 29 F.3d at 243 n.1.

question of fact." *Pierce v. United States*, 718 F.2d 825, 829 (6th Cir. 1983); *see also Toth v. Yoder Co.*, 749 F.2d 1190, 1196 (6th Cir. 1984) ("Proximate causation, or the lack of it, is generally a question of fact to be decided by a jury.").

Based on Plaintiff's evidence, a reasonable jury could find that the excessive risk of inmate-on-inmate assault stemmed from an atmosphere of deliberate indifference reflected in Jarnagin's failure to institute measures to alleviate overcrowding and to ensure that inmates were properly classified and that security checks were regularly conducted.[16]

      d.     <u>Supervisory Liability</u>

Finally, Defendants argue that Jarnagin cannot be held individually liable because he had no direct interactions with Plaintiff. (Doc. 33, at 16–17.) The Sixth Circuit has held that § 1983 liability "must be based on more than respondeat superior, or the right to control employees." *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). "Thus, liability under § 1983 must be based on active unconstitutional behavior and cannot be based upon 'a mere failure to act.'" *Id.* (citing *Salehpour v. Univ. of Tenn.*, 159 F.3d 199, 206 (6th Cir. 1998)). However, liability may attach to a supervisory official if the plaintiff can "show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Taylor*, 69 F.3d at 81. The record shows that, for at least ten years,

---

[16] Defendants rely on *Doe v. Sullivan County, Tennessee*, 956 F.2d 545 (6th Cir. 1992), to support their causation argument. In *Doe*, the Sixth Circuit affirmed the district court's granting of a direct verdict in favor of defendants, finding that the plaintiff had not produced sufficient evidence of causation. 956 F.2d at 550. This outcome is in harmony with the general proposition that proximate cause is a question of fact; in *Doe*, the district court had the benefit of a trial and this Court is mindful that denying summary judgment does not preclude later granting a directed verdict on the issue of causation.

Jarnagin received TCI reports outlining the abysmal conditions at the Jail and increasing number of inmate-on-assaults but, aside from requesting funding and hiring a few more guards, took little action to change the conditions. Although Jarnagin himself did not have direct interaction with Plaintiff in this case, the evidence presented is at least sufficient for a jury to infer that Jarnagin "implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate," *Taylor*, 69 F.3d at 81, as shown by the fact that these incidents were widespread and there is little evidence of measures taken to stem such incidents. *See Leach v. Shelby Cty. Sheriff*, 891 F.2d 1241, 1246 (6th Cir. 1989). "Courts are not required to ignore the fact of life that policies can be and often are subtly but effectively promulgated by seemingly benign conduct." *Id.*

There remain questions of fact that preclude a finding of qualified immunity and make it inappropriate to grant summary judgment on Plaintiff's § 1983 claim premised on Jarnagin's failure to protect him. The Court will, therefore, **DENY** summary judgment on this claim.

### ii. *Hamblen County*

Hamblen County asserts that it is entitled to summary judgment because (1) no Hamblen County official committed an underlying constitutional violation, and (2) there was no policy, practice, procedure, or failure to train or discipline that caused Plaintiff's injuries. (Doc. 33, at 17–22.) As a threshold matter, the Court has found there remain questions of fact as to whether there was an underlying constitutional violation. Accordingly, summary judgment on Defendants' first ground is inappropriate. The Court, will, however, consider Defendants' second argument.

A municipality cannot be held liable under a respondeat superior theory for § 1983 violations. *Spears v. Ruth*, 589 F.3d 249, 256 n.6 (6th Cir. 2009) (citing *Monell v. N.Y.C. Dep't*

*of Soc. Servs.*, 436 U.S. 658, 691 (1978)); *see also Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011) (stating that municipalities "are not vicariously liable under § 1983 for their employees' actions") (citations omitted). Rather, municipalities may only be liable where the plaintiff establishes that the municipality engaged in a "policy or custom" that was the "moving force" behind the deprivation of the plaintiff's rights. *Monell*, 436 U.S. at 694; *see also Doe v. Claiborne Cty., Tenn.*, 103 F.3d 495, 507 (6th Cir. 1996) ("Under *Monell*, the [defendants] cannot be found liable unless the plaintiff can establish that an officially executed policy, or the toleration of a custom . . . leads to, causes, or results in the deprivation of a constitutionally protected right."). "A litigant can show a policy or custom through reference to: (1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Agema v. City of Allegan*, 826 F.3d 326, 331 (6th Cir. 2016).

Plaintiff asserts § 1983 claims against Hamblen County premised on Hamblen County's alleged custom of ignoring dangerous jail conditions and Hamblen County's failure to train its employees.

### a.     Custom of Ignoring Dangerous Conditions

Hamblen County argues it is entitled to summary judgment on this claim because "it did not have any policy, practice, or procedure that caused any alleged assault" against Plaintiff. (Doc. 33, at 18.) In response, Plaintiff argues that Hamblen County engages in a custom or practice of ignoring unsafe jail conditions and there remain questions of fact as to whether this custom resulted in his assault. (Doc. 39, at 22–24.)

Liability may be imposed on a county only when its policy or custom "caused the plaintiff's injury and a 'direct causal link' existed between the policy and the purported denial" of the plaintiff's rights. *Jones v. Muskegon Cty.*, 625 F.3d 935, 946 (6th Cir. 2010) (citing *Ford v. Cty. of Grand Traverse*, 535 F.3d 483, 495–97 (6th Cir. 2008)). In cases where no formal policy exists, "the critical question is whether there is a particular custom or practice that 'although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law.'" *Id.* (quoting *McClendon v. City of Detroit*, 255 F. App'x 980, 982 (6th Cir. 2007)). Thus, to prevail on this theory, a plaintiff must demonstrate, by a preponderance of the evidence, that "there was a clear and persistent pattern of illegal activity; the [county] had notice of it; the [county] tacitly approved the unconstitutional activity such that its deliberate indifference amounts to an official policy of inaction; and this custom or policy of inaction was the moving force behind the constitutional deprivation." *Aureus Holdings, Ltd. v. Detroit City*, 303 F. App'x 265, 270 (6th Cir. 2008). However, "[a] plaintiff cannot establish a custom solely by pointing to the facts of his own case"; rather, he must show "several separate instances" of similar misconduct. *Payne v. Sevier Cty., Tenn.*, 681 F. App'x 443, 446 (6th Cir. 2017) (quoting *Thomas v. City of Chattanooga*, 398 F.3d 426, 433–34 (6th Cir. 2005)); *accord Daniel v. Cook Cty.*, 833 F.3d 728, 734 (7th Cir. 2016) ("We have said in general terms that an inmate can meet this burden by offering competent evidence tending to show a general pattern of repeated behavior (*i.e.*, something greater than a mere isolated event).") (citation and internal quotation marks omitted).

The evidence relied on by Plaintiff raises a genuine dispute of material fact as to whether Hamblen County's failure to remedy unsafe jail conditions resulting in increasing numbers of inmate-on-inmate assaults amounts to a custom of deliberate indifference. As described above,

Plaintiff has pointed to years of TCI reports detailing Hamblen County Jail's deficiencies and the resulting increase on inmate-on-inmate assaults. *Compare Leach*, 891 F.2d at 1248 (holding that because "at least 14 other paraplegics had received similar deplorable treatment, it is fair to say that the need for more adequate supervision was so obvious and the likelihood that the inadequacy would result in the violation of constitutional rights was so great that the County . . . can be held liable"), *with Aurueus Holdings*, 303 F. App'x at 270 ("[The plaintiff] has merely *argued* the existence of . . . a policy of inaction or 'de facto policy' and has adduced no *evidence* of a pattern of similar activity. Such bald allegations are clearly insufficient to forestall summary judgment."). And, although Hamblen County points to its practice that correctional officers walked in each cell or pod area at least once an hour, there is a factual dispute as to the frequency of this practice, as demonstrated by the TCI reports and Plaintiff's testimony. Finally, viewing the facts in the light most favorable to Plaintiff, a reasonable jury could infer that Hamblen County's custom of deliberate indifference to the conditions of its Jail was the moving force behind Plaintiff's assault. Accordingly, the Court will **DENY** summary judgment on this claim.

      b. <u>Failure to Train</u>

To succeed on a claim for municipal liability based on a failure to train its employees, a plaintiff must prove that: "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006) (citation omitted). "[M]ere allegations that an officer was improperly trained or that an injury could have been avoided with better training are insufficient to make out deliberate indifference." *Harvey v. Campbell Cty., Tenn.*, 453 F. App'x 557, 563 (6th Cir. 2011).

A plaintiff can succeed on a claim for failure to train in one of two ways. First, a plaintiff may show "[a] pattern of similar constitutional violations by untrained employees and a defendant's continued adherence to an approach that [it] knows or should know has failed to prevent tortious conduct by employees, thus establishing the conscious disregard for the consequences of [its] action—the deliberate indifference—necessary to trigger municipal liability." *Shadrick v. Hopkins Cty., Ky.*, 805 F.3d 724, 738–39 (6th Cir. 2015) (internal quotation marks and citation omitted). Alternatively, a plaintiff can establish "a single violation of federal rights, accompanied by a showing that [the defendant] has failed to train its employees to handle recurring situations presenting an obvious potential for a constitutional violation." *Id.* at 739. This latter mode of proof is available only "where a federal rights violation may be a highly predictable consequence of a failure to equip [employees] with specific tools to handle recurring situations." *Id.* (citation omitted).

In *Shadrick*, the Sixth Circuit determined summary judgment was inappropriate because questions of fact remained as to whether the plaintiff satisfied this second mode of proof. *Id.* Specifically, the court noted:

> [The defendant's] administrators knew that the LPN nurses interacted with dozens of inmates presenting a wide and recurring range of medical conditions that required timely and accurate diagnosis and treatment . . . a reasonable jury could find that the potential risk of the commission of constitutional torts by LPN nurses who lack the essential knowledge, tools, preparation, and authority to respond to the recurring medical needs of prisoners in the jail setting is so obvious that [the defendant's] failure to provide adequate training and supervision to those nurses constitutes deliberate indifference to the risk.

*Id.* at 739–40.

Hamblen County has pointed to evidence that its correctional officers receive forty hours of training in their first year and every year thereafter and shadow a correctional officer until they are cleared to work on their own. (Doc. 32-1, at 55.) However, Plaintiff argues that there is

no evidence "that Jail officers are provided any training that would permit them to better manage a severely overcrowded jail or to assess and appropriately classify inmates." (Doc. 39, at 24–25.) Moreover, Plaintiff has pointed to evidence of increasing issues with overcrowding, classification issues leading to inmate-on-inmate assaults, and Jarnagin's knowledge that correctional officers would regularly be working under these conditions. Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could find that the potential risk of the commission of constitutional torts by correctional officers who lack the essential knowledge, tools, preparation, and authority to respond to these conditions in the jail setting is so obvious that Hamblen County's failure to provide adequate training and supervision to those correctional officers constitutes deliberate indifference to the risk. Reasonable jurors could further determine that Hamblen County's inadequate training actually caused, or was closely related to, Plaintiff's injury. Accordingly, the Court will **DENY** Defendants' motion for summary judgment on this claim.

### iii. *Punitive Damages*

Defendants argue that they cannot be held liable for punitive damages because the facts show Jarnagin did not act in callous disregard to Plaintiff's constitutional rights and punitive damages are precluded in suits against government entities. (Doc. 33, at 24–25.)

A "jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983); *see also King v. Zamiara*, 788 F.3d 207, 216 (6th Cir. 2015) ("Because punitive damages are a mechanism for punishing the defendant for 'willful or malicious conduct,' they may be granted 'only on a showing of the requisite intent.'"). "The allowance of

such damages involves an evaluation of the nature of the conduct in question, the wisdom of some form of pecuniary punishment, and the advisability of a deterrent." *Wesley v. Campbell*, 864 F.3d 433, 443 (6th Cir. 2017) (quoting *Gordon v. Norman*, 788 F.2d 1194, 1199 (6th Cir. 1986)). A municipality, however, is immune from punitive damages under § 1983. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981).

As described above, there remain questions of fact as to whether Jarnagin acted with deliberate indifference. Viewing these facts in the light most favorable to Plaintiff, the Court will **DENY** Defendants' motion for summary judgment as to Jarnagin. As to Hamblen County, however, the Court will **GRANT** Defendants' motion for summary judgment on the issue of punitive damages.

### B. State-Law Claims

#### i. Negligence

Jarnagin argues he is entitled to summary judgment on Plaintiff's negligence claim because he is immune from suit under the Tennessee Governmental Tort Liability Act ("GTLA"). (Doc. 33, at 22.) The GTLA prohibits claims against an employee when the immunity of the governmental entity is removed with respect to that claim. *See* Tenn. Code Ann. § 29-20-310(b). The GTLA removes immunity from suit of all governmental entities for injury proximately caused by negligent acts or omission of employees within the scope of their employment "except if the injury arises out of . . . civil rights." Tenn. Code Ann. § 29-20-205(2). Courts have construed the term "civil rights" as used in § 29–20–205(2) "as meaning and including claims arising under the federal civil rights laws, *e.g.*, 42 U.S.C. § 1983 and the United States Constitution." *Campbell v. Anderson Cty.*, 695 F. Supp. 2d 764, 778 (E.D. Tenn.

2010).  Because Plaintiff's negligence claims against Defendants[17] are predicated on the alleged

violation of his civil rights, Hamblen County is immune from suit.  Hamblen County is,

therefore, entitled to summary judgment on this claim.

However, because Hamblen County is immune with respect to Plaintiff's negligence

claim, he may maintain such a claim against Jarnagin.  Tenn. Code Ann. § 29-20-205(2); *see*

*Baker v. Snyder*, No. 1:05 CV 152, 2006 WL 2645163, at *11 (E.D. Tenn. Sept. 14, 2006).  To

succeed on a claim for negligence, a plaintiff must prove:  (1) a duty of care owed by the

defendant to the plaintiff; (2) conduct by the defendant falling below the standard of care

amounting to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate

or legal cause.  *E.g.*, *Hale v. Ostrow*, 166 S.W.3d 713, 716 (Tenn. 2005).  Aside from immunity,

Defendants argue only that no Hamblen County official committed a negligent act that

proximately caused Plaintiff's injury.  (*See* Doc. 33, at 24.)  Defendants rely on *Boswell v.*

*YMCA of Middle Tennessee*, No. M201800180COAR3CV, 2019 WL 1422926 (Tenn. Ct. App.

Mar. 29, 2019), to support its argument that Plaintiff's assault was not reasonably foreseeable.

This case is inapposite.  *Boswell* involved an alleged assault in the locker room of a fitness club.

2019 WL 1422926 , at *1–*2.  The court found that the plaintiff failed to introduce evidence that

the defendant fitness club was aware of sexual assaults by the alleged perpetrator or others at the

facility, and therefore, no reasonable person could conclude that the alleged assault was

foreseeable.  *Id.* at *6–7.  In this case, however, there is sufficient evidence from which a jury

could conclude Jarnagin was aware of the conditions of the Hamblen County Jail, including prior

inmate-on-inmate assaults and that, therefore, such an assault was foreseeable.  Additionally, as

---

[17] Plaintiff does not explicitly abandon his claim for negligence against Hamblen County; he
does, however, fail to address it at all in his response to Defendants' motion for summary
judgment.  (*See generally* Doc. 39.)

noted earlier in the Court's opinion, proximate cause is generally a question of fact to be decided by the jury. Viewed in the light most favorable to Plaintiff, he has pointed to facts, as described above, from which a jury could infer that Jarnagin acted negligently and that such negligence caused Plaintiff's injury. Accordingly, the Court will **DENY** Defendants' motion for summary judgment on this claim as to Jarnagin and **GRANT** Defendants' motion as to Hamblen County.

> ### ii. *Intentional Infliction of Emotional Distress*

Hamblen County argues it is entitled to summary judgment on Plaintiff's claim for intentional infliction of emotional distress because it is immune under the GTLA. (Doc. 33, at 24.) In his response, Plaintiff made clear that he is abandoning his claim for intentional infliction of emotional distress against Hamblen County. (Doc. 39, at 6 n.3.) Accordingly, Hamblen County is entitled to summary judgment on this claim.

Jarnagin argues he is also entitled to summary judgment on this claim. In Tennessee, three elements are required for intentional-infliction-of-emotional-distress claims: (1) "the conduct complained of must have been intentional or reckless"; (2) "the conduct must have been so outrageous that it is not tolerated by civilized society"; and (3) "the conduct complained of must have caused serious mental injury." *Doe 1 ex rel. Doe 1 v. Roman Catholic Diocese of Nashville*, 154 S.W.3d 22, 41 (Tenn. 2005).

The "outrageous" prong requires conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Hutson v. Shackelford*, 390 F. Supp. 997, 998 (E.D. Tenn. 1974); *see also Lourcey v. Estate of Scarlett*, 146 S.W.3d 48, 51 (Tenn. 2004). "The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it." *Hutson*, 390 F. Supp. at 998; *see Gibson v. Thurman*, No. 3:07-CV-365,

Case 2:17-cv-00178-TRM-MCLC   Document 41   Filed 04/12/19   Page 26 of 28   PageID #: 686

2009 WL 2579656, at *8 (E.D. Tenn. Aug. 17, 2009) (applying Tennessee law and finding that "the three-way mistaken distribution of cremains and resulting confusion does not rise to the level of extreme conduct required under the outrageous conduct prong").  Plaintiff has presented evidence that deeply troubling conditions existed in the Hamblen County Jail for over a decade that Jarnagin failed to remedy.  A jury could infer that these facts are "so conspicuously offensive as to rise to the required level of outrage."  *Gibson*, 2009 WL 2579656, at *8.

Additionally, the third prong for intentional-infliction-of-emotional-distress claims requires that "the defendant's conduct caused a serious or severe emotional injury."  *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 206 (Tenn. 2012).  The Tennessee Supreme Court has made clear that "there should not be recovery for every minor disturbance to a person's mental tranquility, but only for serious or severe emotional injuries."  *Id.* at 208 (internal citations and quotation marks omitted); *see also Camper v. Minor*, 915 S.W.2d 437, 446 (Tenn. 1996) ("A 'serious' or 'severe' emotional injury occurs 'where a reasonable person, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case.'").  Plaintiff testified that, as a result of the sexual assault he suffered, "[he] do[esn't] enjoy life as much as [he] used to . . . [he's] always looking behind [his] shoulder."  (Doc. 39-1, at 89.)  He also testified that the assault has affected his ability to date, that he has experienced sadness and depression, that he is mistrustful of everyone, and that he spends the majority of his time alone and secluded in his room.  (*Id.* at 89–90.)  Viewing this evidence in the light most favorable to Plaintiff, a jury could also infer that Plaintiff has suffered a severe emotional injury

Case 2:17-cv-00178-TRM-MCLC   Document 41   Filed 04/12/19   Page 27 of 28   PageID #: 687

as a result of Jarnagin's actions.[18]  Accordingly, summary judgment is inappropriate on this claim.

IV.    CONCLUSION

For the reasons set forth above, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion for summary judgment (Doc. 32).  Plaintiff's claims against Hamblen County for punitive damages, negligence, and intentional infliction of emotional distress are hereby **DISMISSED WITH PREJUDICE.**

**SO ORDERED.**

*/s/ Travis R. McDonough*
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**

---

[18] In their reply, Defendants argue that Plaintiff's statements do not support a "serious mental injury" because they do not show that Plaintiff "suffered significant impairment in [his] daily functioning."  (Doc. 40, at 10.) *Rogers* sets out a list of "nonexclusive factors" to "inform the analysis"; "evidence that the defendant's conduct caused the plaintiff to suffer significant impairment in his or her daily functioning" is just one of these factors and is not dispositive.  367 S.W.3d at 209–10.